IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2015

STATE OF TENNESSEE v. NICOS BROADNAX AND AARON COOK

Appeal from the Criminal Court for Shelby County
No. 12-02761        James C. Beasley, Jr., Judge

No. W2014-00506-CCA-R3-CD   -   Filed May 15, 2015

A Shelby County jury convicted Nicos Broadnax and Aaron Cook of aggravated robbery. The trial court ordered Defendant Broadnax, as a Range I standard offender, to serve eleven years, and ordered Defendant Cook, as a multiple offender, to serve nineteen years in the Tennessee Department of Correction.   On appeal, Defendant Broadnax asserts that the evidence is insufficient to support his conviction.   Defendant Cook also challenges the sufficiency of the evidence but additionally asserts that: (1) the trial court improperly declined to strike the jury venire following notice that the jury pool was tainted by comments from observers at the trial; (2) the prosecutor's misstatement of facts during closing argument unfairly prejudiced him; and (3) his sentence is excessive.   After a thorough review of the record and applicable law, we affirm the trial court's judgments.

Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Stephen C. Bush, Public Defender, and Tony N. Brayton, Assistant Public Defender, Memphis, Tennessee, for the appellant, Nicos Broadnax.

Ebony N. Dawkins, Memphis, Tennessee, for the appellant, Aaron Cook.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION
I. Background and Facts
A. At Trial

This case arises from the beating and robbery of Oscar Rivera, the victim, in October 2011, for which a Shelby County grand jury indicted the defendants for aggravated robbery. At a trial on the charges, the parties presented the following evidence: The victim testified that he was forty-seven years old and a restaurant owner. He recalled that on October 19, 2011, at a little after 11:00 p.m., he was walking on Macon Road towards Wells Station in Memphis, Tennessee. He explained that he had parked his truck at a Texaco station on Wells Station and, from there, walked to a nearby Mexican bakery that he found to be closed. As he walked back to his truck he heard "some noise" and turned around to see "three or four black men" behind him.

The victim testified that the men were yelling and cursing at him, so he began to run. The victim said that a gun was also aimed at him. As he ran away from the men, he stumbled and fell to the ground. The victim said that, after falling, he attempted to turn around to see the men, and one of the men hit him in the back of the head with the gun. One of the men demanded money from the victim, and the victim pointed to his back pocket where he had "a little bit over" $200 in cash. The victim said there was blood running down his face at this point. One of the men grabbed both the cash and the victim's T-Mobile cell phone. The victim said he "had no option" but to allow the men to take his belongings because they had a gun pointed at his face, and the men had beaten him. He stated that the men beat him on his head and face, leaving him in the fetal position on the ground. He remembered seeing a white car and "somebody yell[ing] something" before one of the men kicked him "on [his] testicles."

The victim testified that he was "in a bad condition," but, when he got up off the ground, the men began running away from him. He stated that he walked toward the gas station. The victim could not provide a "general description" of his assailants but confirmed that they were "young," "African American" men. He said that he never spoke to any of the assailants. Once he arrived back at the gas station, a "Latin person" told him that he would call an ambulance. After five minutes, the victim observed a "white person" talking with the police about the direction in which his assailants had fled. The victim confirmed that he did not know any of the men who attacked him and did not owe any of them money. The victim was taken to the hospital where he stayed overnight and was released the following day. The victim identified scars on his face and head that remained from this incident. After his release from the hospital, the victim stayed home for two weeks recuperating, unable to go to work during this time.

On cross-examination by Defendant Broadnax's attorney, the victim said that the area where this incident occurred was not well-lit. He said that he was able to run

approximately eight to ten steps before he fell and that the men reached him quickly after he fell to the ground. The victim described his fall, saying that he caught himself with his arms before his face hit the ground. He stated that only two of the men beat him. The victim said that he believed he was hit in the head with a gun rather than a fist because the blow caused a laceration.

On cross-examination by Defendant Cook's attorney, the victim stated that one of the men who approached him that night wore a red t-shirt. He confirmed that he was unable to identify any of the people involved in the beating and robbery that night.

Jeffrey Bartram testified that on October 19, 2011, he was at his residence on Macon Road. He recalled that he heard "hollering and screaming" outside and looked out the window in his front door. Outside, he saw three black men standing over a hispanic man, beating and robbing him. Mr. Bartram said that he could hear the black men yelling at the victim to give them "what [the victim] got in [his] pockets." He observed the men striking the victim in the face with a silver handgun, and he watched as the men took a cell phone from the victim. Mr. Bartram called the police and then stepped outside his house and "everybody scattered." He said that two of the men ran down the opposite side of the street on the sidewalk to a house directly across the street on the corner of Wells Station and Macon Road. The third man spoke with someone in a vehicle that had pulled up before running westbound down the middle of Macon Road. Mr. Bartram said the victim remained on the ground in the fetal position after his assailants fled. The victim then got up off the ground and "staggered" toward a Texaco station down the street.

Mr. Bartram testified that, while still on the telephone with dispatch, he walked to the Texaco station to check on the victim. He found the victim inside the store of the gas station "bleeding everywhere." The dispatch operator instructed Mr. Bartram to return to his house to wait for police. The police later arrived and took Mr. Bartram to the Texaco station where the police had detained several suspects. Mr. Bartram explained that the beating and robbery occurred next to a street light, so the participants were "pretty much in the spotlight of the street light." While at the Texaco station, Mr. Bartram identified the two suspects that he had observed beating the victim. He also identified in court Defendant Broadnax and Defendant Cook as the men he had observed beating and robbing the victim. Mr. Bartram recalled that one of the assailants wore a "hoodie," one wore a striped Polo shirt, and one wore a white shirt. He identified the "hoodie" that one of the men wore.

Mr. Bartram described the involvement of the three men in this incident as follows:

They were standing over him, all three of them. [The victim] was laying in a ball in the middle of the street and they were standing over him just mercilessly beating him. Kicking him, punching him. . . . One of them was holding the gun and pointing it at [the victim], then they hit [the victim] with it, then they'd hold [the gun] on [the victim] for a little bit longer, then they hit [the victim] with it again.

On cross-examination by Defendant Broadnax's attorney, Mr. Bartram testified that these events occurred around 11:00 p.m. He estimated that the beating occurred approximately twenty or thirty feet from his front door, where he was when he saw the incident. Mr. Bartram agreed that he testified at the preliminary hearing in this matter that Defendant Broadnax did not have the gun but that he could not now recall if Defendant Broadnax had possessed the gun. He confirmed that there was nothing obstructing his view of the beating and robbery that night. Mr. Bartram stated that he did not actually see the defendants go into the house on Macon Road but that he watched them enter the yard of that residence.

Eduardo Rodriguez testified that he worked at the Texaco station on the night of these events. He recalled that around 11:00 p.m., he observed "a few young African American guys" running to a house located across the street from the Texaco station. Five minutes later, he observed the victim, who appeared to be "disfigured from a beating," walking toward the Texaco station. Mr. Rodriguez went outside and attempted to assist the victim and then called an ambulance.

Lindsey Johnson testified that, on the night of October 19, 2011, she was in a house on Macon Road across the street from the Texaco station. She stated that in the house with her were Defendant Broadnax, Defendant Cook, Latasha Payton, and Joseph Washington. She said that she had known Defendant Cook for three years and Defendant Broadnax for two years and identified both men in the courtroom. She recalled that around 11:00 p.m., Defendant Broadnax and Defendant Cook entered the house and told Ms. Johnson that a "Mexican had jumped on" them, and they had gone "over there and they both beat [the victim's] a**." They instructed Ms. Johnson that, if police arrived, she was to tell the police that "they ain't heard from him." She said the men mentioned a T-Mobile cell phone, and Mr. Washington responded that he knew how to "unlock it." Ms. Johnson stated that she observed a weapon with a black handle inside the residence that night.

On cross-examination by Defendant Broadnax's attorney, Ms. Johnson testified that it was Defendant Cook who had the victim's cell phone on the night of October 19,

2011. Ms. Johnson clarified that she did not see a gun that night but rather saw a gun grip sitting on a chair before the defendants arrived.

James Moore, a Memphis Police Department officer, testified that he responded to a house on the corner of Macon Road and Wells Station after 11:00 p.m. on October 19, 2011. Once there, he worked with other officers to create a perimeter around the residence to ensure that no one entered or exited the residence. Police officers searched the residence, and upon their exit, one of the officers observed a hand in the garage. Officer Moore, along with several other officers, re-entered the residence and went through the kitchen into the garage. Once in the garage, Officer Moore observed a person hiding under a tarp, and he took this person into custody. Officer Moore identified Defendant Cook as the person found in the garage. Another suspect was also found in the garage and a third individual was found at the scene but not inside the garage.

Justin Sheriff, a Memphis Police Department officer, testified that he conducted the crime scene investigation of the residence at the intersection of Macon Road and Wells Station. At this location was a single story residence with white trim. Other police officers had already secured the residence by the time Officer Sheriff arrived. Officer Sheriff photographed a stainless steel pistol that the police had found behind a washing machine and dryer inside the residence. Officer Sheriff opened up the cylinder of the pistol and found live rounds inside the cylinder. In a bedroom of the residence, Officer Sheriff collected a purple bag that had twelve rounds of .38 special ammunition inside it. Officer Sheriff identified other photographs that he took at the scene. One of the photographs depicted a pistol grip that police officers found in the refrigerator, separate from the weapon.

Officer Sheriff testified that the pistol was a Ruger SP101. He identified a photograph of the pistol and the serial number on the pistol. Officer Sheriff identified the five "live rounds" taken from inside the pistol.

On cross-examination by Defendant Broadnax's attorney, Officer Sheriff confirmed that the pistol was found inside a sock behind the washer and dryer. He did not recall any blood being on the sock or on the pistol.

Adrian Friday, a Memphis Police Department officer, testified that he was dispatched to a robbery near Macon Road and Wells Station. When he arrived, police officers had already surrounded the house. When the homeowner exited his residence, Officer Friday provided him with a consent to search form, which the homeowner signed. After receiving the consent to search, four police officers went inside to search the

residence. After a short period of time, two of the officers returned outside and asked Officer Friday if he would assist in the search. As Officer Friday approached the front door of the house from the south end of the outside of the house, he shone his flashlight through the garage window and observed "an arm of a male black" "sticking out." He alerted the other officers that someone was hiding inside the garage, and the officers made entry into the garage through the house.

Officer Friday testified that one male was found by the garage door and the other was hiding inside a pile of trash bags and clothes. Both men were taken into custody and escorted out of the residence. Officer Friday recalled that Defendant Cook was one of the men taken into custody and that he was wearing a blue "hoodie" at the time of his arrest. After the men were taken out of the residence, police officers continued to search the residence for a gun. Officer Friday said that he found "the butt of the gun" inside the bottom right drawer of the refrigerator and the "main J frame" of the gun "up under a washing machine" inside a white sock. Officer Friday estimated that the garage door was approximately three feet from the washing machine and dryer.

Glenn Barber, a Memphis Police Department officer, testified that three suspects were developed in this case: Defendant Broadnax, Defendant Cook, and Joseph Washington. Sergeant Barber said that he interviewed Defendant Broadnax and Defendant Cook. During the interview, Defendant Broadnax stated that he was involved in the robbery and "a [cell phone] was taken." He told police that he saw the victim walking down Macon Road and chased him. The victim fell to the ground after being struck one time by Defendant Broadnax. Once on the ground, the victim was hit three or four more times. Defendant Broadnax told the police that, after the incident, he went to "Joe's house" where he gave the gun, a silver .38 revolver with a black handle, to "Lindsey." Defendant Broadnax stated that he had the gun in his waistband at the time of the robbery but used his fist to punch the victim. When he saw police outside the house, he hid inside the garage.

Sergeant Barber testified that Defendant Cook said that he was having a bad day and "someone" told him he should release his frustration by engaging in a fight. Defendant Cook stated that he saw the victim walking down Macon Road and began to run behind the victim. The victim also began running and, when Defendant Cook caught up to the victim, the victim was already on the ground. Defendant Cook explained the blood on his clothing by telling Sergeant Barber that the victim attempted to pull up off the ground by holding on to Defendant Cook. Defendant Cook then went to "Joe's house and was handed a cell phone." Sergeant Barber recalled that Defendant Cook told him that, once he was back at the residence, "people were asking why he was kind of nervous," and Defendant Cook responded that "he just got in a fight with a Mexican." Defendant Cook told Sergeant Barber that, when he noticed the police were outside the

residence, he threw the cell phone on the bed and hid in the garage. When asked if Defendant Cook ever "mention[ed] anything about a weapon," Sergeant Barber responded, "[h]e said it was a silver .38 revolver." Defendant Cook denied any involvement in a robbery when questioned by the police.

Based on this evidence, the jury convicted Defendant Broadnax and Defendant Cook of aggravated robbery.

## B. Sentencing Hearing

At the sentencing hearing, the victim testified that, following these events, his life had been "very stressful." The victim sustained injuries to his left eye and, at the time of the hearing, was still experiencing difficulty with his sight. His doctor told him that there was a hemorrhage and scar tissue in his eye that was impacting his eyesight. He stated that he also had been undergoing treatment for cancer for approximately a year. The colon cancer was detected three months after the beating and robbery. His doctors had told him that, following his cancer treatment, he will likely need eye surgery otherwise he may lose his eyesight in the damaged eye. He stated that, prior to the assault, he had perfect vision. The victim testified that he was no longer able to work as much as he used to and now his wife and family work in his place. He explained that he moved the location of his restaurant and his home "for fear of having that happen to [him] again."

After hearing the evidence and in consideration of the purposes of sentencing, the trial court sentenced Defendant Broadnax as a Range I, standard offender, to eleven years, and Defendant Cook as a Range II, multiple offender, to nineteen years in the Tennessee Department of Correction. It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendant Broadnax asserts that the evidence is insufficient to support his conviction. Defendant Cook also challenges the sufficiency of the evidence but additionally asserts that: (1) the trial court improperly declined to strike the jury venire following notice that the jury pool was tainted by comments from observers at the trial; (2) the prosecutor's misstatement of facts during closing argument unfairly prejudiced him; and (3) his sentence is excessive.

## A. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence supporting their convictions. The defendants assert that the State failed to present sufficient proof that

either defendant employed a deadly weapon during the course of the robbery. Additionally, Defendant Cook argues that there was insufficient proof that the victim sustained serious bodily injury and insufficient proof that any property was taken from the victim. The State responds that there is sufficient evidence upon which a jury could find the defendants guilty beyond a reasonable doubt of aggravated robbery. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).    This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.    *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).    Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.    *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As relevant to this case, a conviction for aggravated robbery requires proof beyond a reasonable doubt that the defendants committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with the use or display of a deadly weapon.    T.C.A. §§ 39-13-401(a), -402(a)(1) (2014).

The evidence, considered in the light most favorable to the State, shows that the defendants observed the victim walking down Macon Road alone at night.    The defendants ran toward the victim causing him to flee and fall on the pavement after being struck on the head.    The victim was beaten, kicked, and hit on the back of the head with the handle of a gun, causing a laceration.    The defendants demanded money from the victim, who pointed to his rear pocket where he had $200 and a T-Mobile cell phone.    Both the cash and the cell phone were taken.    When Mr. Bartram, who had observed the beating and robbery, stepped out on his porch, the defendants fled to a nearby residence.    Inside the residence, the defendants showed other people the T-Mobile cell phone taken during the robbery, and Mr. Washington confirmed that he could "unlock" the phone.    Shortly thereafter, the police found both defendants hiding in the garage of the residence and a loaded gun hidden inside a sock underneath the washing machine near the entry to the garage.    The defendants were taken into custody and provided statements to the police.    Both defendants admitted their presence during the beating and robbery.    Defendant Broadnax denied use of a gun but admitted he had a gun in his waistband at the time of these events.    He further admitted that the victim's cell phone was taken.    Defendant Cook "mentioned" a silver revolver, and both the victim and Mr. Bartram testified that a gun was used during the course of the robbery.

As to Defendant Cook's contention that the State failed to show serious bodily injury,    we note that the State did not proceed under this element of the statute, but relied on proof of the use or display of a deadly weapon. The evidence proves that the defendants took money and a cell phone from the victim while placing him in fear with the use or display of a deadly weapon.    Accordingly, we conclude that the proof is sufficient to support the defendants    convictions for aggravated robbery beyond a reasonable doubt.    The defendants are not entitled to relief as to this issue.

## B.  Jury Venire

Defendant Cook contends that the trial court should have struck the entire jury

venire during jury selection due to remarks made by an observer in the hallway outside the courtroom during jury selection. The State responds that the trial court acted within its discretion when it denied the motion. We agree with the State.

A potential juror notified the trial court that he had overheard "the defendant's girlfriend" say "he was guilty and somebody put him up to it." The potential juror explained that he had returned from lunch early and was in the hallway when this statement was made. He indicated that there were "maybe five, six" other people in the hallway at the time. The woman who made this statement was later identified as Defendant Broadnax's ex-girlfriend, Della Mason. The trial court dismissed the potential juror and then made a general inquiry of the jury venire regarding any comments overheard in the hallway. The trial court then privately interviewed each of the potential jurors who had overheard Ms. Mason's comments in the hallway. Upon individual questioning, each of the potential jurors conveyed that they had overheard Ms. Mason make statements unrelated to the case. The trial court excluded Ms. Mason from the court room.

The attorneys representing both defendants made a motion to strike the jury panel based upon these statements. The trial court denied the motion, stating:

> [T]he juror who was juror number four, b[r]ought this to our attention. We excused him because he did hear some things that he felt impacted him.
>
> I then questioned one, two, three, four, six, seven, ten other jurors who indicated they heard this woman talking. All of them indicated she was just talking loud and making noise and talking about the system and different things. None of them indicated they heard anything about the case, anything that would impact them about the case, even any discussion about the case, so I'm satisfied that she didn't do anything that would cause me to dismiss this jury pool.
>
> I have barred her from the floor. She's not going to be up here anymore. But I'm not going to dismiss this pool and start all over again. So I'll note your exceptions and we'll go forward.

A defendant is entitled to a trial "by an impartial jury," with the jurors "render[ing] their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." U.S. Const. amend. VI; Tenn. Const. art. I § 9; *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013). "When a jury has been subjected to either extraneous prejudicial information or an improper outside influence,

the validity of the verdict is questionable." *Adams*, 405 S.W.3d at 650.

> [E]xtraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. An improper outside influence is any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.

*Id*. at 650-51 (internal citations and quotations omitted).

When a defendant challenges the validity of a verdict on the basis of a tainted jury, he "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id*. at 651. If a defendant makes this showing, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id*. (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). In determining whether the State has rebutted the presumption of prejudice, the trial court should consider the following factors: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror or jurors; and (4) the weight of the evidence adduced at trial. *Id*. at 654 (footnote omitted). Our Supreme Court has said that "[n]o single factor is dispositive. Instead, trial courts should consider all of the factors in light of the ultimate inquiry - whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." *Id*.

Our review of this issue is *de novo*, with the trial court's factual findings accompanied by a presumption of correctness, but no such presumption is given to the trial court's conclusions of law. *Id*. at 656; *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Defendant Cook argues that the trial court erred in denying his motion because the jury was exposed to extraneous prejudicial information. Defendant Cook, however, has failed to make the threshold showing that the jurors were exposed to extraneous prejudicial information that bore on a fact at issue in the case.

The trial court found that there was no proof that members of the jury venire had overheard prejudicial information that bore on a fact at issue in the case. The trial court

˅11˅

individually questioned each of the jurors that had overheard Ms. Mason talking in the hallway. Each of the jurors stated the content of what they had heard her say and none of her comments related to the case. The trial court's findings are supported by the transcript of the questioning of the potential jurors.

Accordingly, Defendant Cook offered no proof that the jury was actually exposed to prejudicial information, and he, thus, falls short of meeting his threshold burden on the issue. Therefore, Defendant Clark is not entitled to relief as to this issue.

## C. Closing Argument

Defendant Cook asserts that the State committed prosecutorial misconduct during closing argument. Specifically, he argues that the State improperly misstated the facts when it argued that Defendant Cook described the pistol used and that he admitted to beating the victim. The State responds that the closing argument was not improper. We agree with the State.

Defendant Cook challenges the following portion of the State's argument:

Here's your facts. They both participated. They both run to that house and they're found immediately after. They both describe the weapon as a .38. They both are hiding adjacent to the room where the gun is hidden and they both admit to beating the victim.

The defendants' attorneys requested a curative instruction, asserting that Sergeant Barber never testified that Defendant "Cook said anything about the gun" or that Defendant Cook was involved in beating the victim. The trial court instructed the jury that the arguments from the attorneys were not to be considered as evidence. The defendants' attorneys then requested a more specific curative instruction. The trial court declined, stating that the testimony was that Defendant Cook said he had been "in a fight with a Mexican" and Defendant Cook saw a silver .38 revolver.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the

evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

In *Goltz*, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn.Code Of Prof'l Responsibility DR 7-106(c)(4).

> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See [State v.J Cauthern*, 967 S.W.2d [726,] 737 (Tenn. 1998); *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6 (quoting Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)). A criminal conviction, however, should not be lightly overturned solely on the basis of the prosecutor's closing argument. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13, (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal).

Defendant Cook asserts that the State violated standards one and five of the ABA Standards Relating to the Prosecution Function and the Defense Function. Our review of the record does not show that the State misstated the facts or argued outside the record. Sergeant Barber testified that Defendant Cook stated that once he had returned to the residence at the corner of Macon Road and Wells Station he was asked why he was so nervous, and he responded that he had just gotten in a fight with a "Mexican." Sergeant Barber also testified that, during the police interview, Defendant Cook described a .38 silver revolver.

Accordingly, we conclude that the State's argument with regard to Defendant Cook's participation in the victim's beating and his description of the weapon used during the commission of this offense was not a misstatement of the facts or argument outside the record. Therefore, Defendant Cook is not entitled to relief as to this issue.

## D. Sentencing

Defendant Cook challenges the trial court's application of three enhancement factors in determining his sentence. Specifically, he asserts that the trial court improperly applied: factor (2), that the victim was a leader in the offense; factor (6), that the personal injuries inflicted upon the victim were particularly great; and factor (7) that the offense was committed to gratify the defendant's desire for pleasure or excitement. The State responds that the trial court properly considered the enhancement and mitigating factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2014); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record

must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d at 555; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

At the sentencing hearing, the trial court properly considered the purposes of sentencing in Tennessee Code Annotated section 40-35-102 and the factors set out in Tennessee Code Annotated section 40-35-210. The trial court noted that Defendant Cook had several prior convictions including aggravated burglary, domestic violence, failure to appear, possession of marijuana, criminal impersonation, burglary of an automobile, robbery, and theft of property. In considering enhancement and mitigating factors, the trial court found enhancement factor (2) applicable, that Defendant Cook was a leader in the offense. T.C.A. § 40-35-114(2). Next, the trial court found enhancement factor (6) applicable, that the personal injuries inflicted upon the victim were particularly great, but stated "I just do not have enough proof in front of me to say that I can put a great deal of emphasis and weight on the injuries to his eye." As to factor (7) that the offense was committed to gratify the defendant's desire for pleasure or excitement, the trial court stated:

> I find that they treated the victim with exceptional cruelty above and beyond what was necessary to rob him. Again because I do not think that was their full goal. I think [ ] part of their goal was to rob him. And but I think part of it was just to gratify their desire for pleasure or excitement and to beat somebody up and to beat them up unmercifully just for the sheer fun of it. And to the extent I think it's well beyond what was necessary to rob him and, therefore, I do think that the victim was allowed to be treated with exceptional cruelty during the commission of this offense including the final blow where he was kicked in the testicles as they were departing.

The trial court also stated that, based upon Defendant Cook's statement to the police that he was having a bad day, "let's just go pick somebody out randomly and beat them up," it appeared Defendant Cook committed this crime "to gratify [his] desire for a little pleasure and excitement." The trial court found no mitigating factors applicable. The trial court stated that it put a "great deal of weight" on Defendant Cook's previous history of criminal convictions and criminal behavior. The sentencing range for this offense is

twelve to twenty years and the trial court imposed a sentence of nineteen years.

The record shows that the trial court complied with the purposes and principles of the Sentencing Act, considered the enhancement and mitigating factors, and sentenced Defendant Cook within the appropriate range. Accordingly, Defendant Cook is not entitled to relief.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE